**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| CENTRALSQUARE TECHNOLOGIES, LLC,<br><br>      Plaintiff,<br><br>    v.<br><br>THE NATIONAL BOARD OF BOILER AND PRESSURE VESSEL INSPECTORS,<br><br>      Defendant. | )<br>)<br>) Case No. 6:26-cv-01472<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT (DEMAND FOR JURY TRIAL) (PERMANENT
INJUNCTIVE RELIEF REQUESTED)**

Plaintiff CentralSquare Technologies, LLC ("CentralSquare") files this

Complaint against Defendant the National Board of Boiler and Pressure

Vessel Inspectors ("NBBI" or "Defendant") and alleges as follows:

**NATURE OF THE ACTION**

1. This is an action for violation of the Defend Trade Secrets Act and for

misappropriation of trade secrets under the Florida Uniform Trade

Secrets Act.

2. CentralSquare previously filed a related action against NBBI in this

District: *CentralSquare Technologies, LLC v. The National Board of*

1

*Boiler and Pressure Vessel Inspectors*, No. 6:25-cv-01294-RBD-DCI (M.D. Fla.) (the "Related Action"). In the Related Action, the Court limited discovery to two examplar of trade secrets: a "confidence score" and an "unreleased update" (including aspects of an unreleased user interface). Those claims remain pending in the Related Action.

3. The present action asserts claims against NBBI that were found by the Court to be not asserted in the Related Action. That is, the present action does not include the two trade secrets pending in the Related Action and instead alleges misappropriation of trade secrets that the Court has found to be outside the scope of the Related Action.

## PARTIES

4.   Plaintiff CentralSquare is a limited liability company organized and existing under the laws of Delaware with its corporate headquarters at 1000 Business Center Drive, Lake Mary, FL 32746.

5.   CentralSquare's trade secrets relate to CentralSquare's Jurisdiction Online platform, including source code, unreleased business plans, and computer architecture ("JO Trade Secrets"). As discussed below, CentralSquare is the owner of the JO Trade Secrets.

6.   On information and belief, Defendant NBBI is a nonprofit corporation organized and existing under the laws of Ohio with its principal place of business at 1055 Crupper Avenue, Columbus, OH 43229. Defendant is a rule setting entity responsible for creating and maintaining standards for inspections of boilers and pressure vessels.

7.   Defendant is involved or has been involved in the creation, implementation, and/or sale of the Jurisdictional Reporting System ("JRS Product"). The JRS Product is a software application designed to apply the rules and standards enforced by Defendant and is marketed as a necessity to follow such standards.

3

## JURISDICTION AND VENUE

8.   This action arises under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. §§ 1836(b)-(c) and the Florida Uniform Trade Secrets Act ("FUTSA"), Fla. Stat. §§ 688.001-688.009.

9.   This Court has subject matter jurisdiction over the federal claims asserted in this Complaint under 28 U.S.C. § 1331 because this action arises under the DTSA. Further, this court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state-law claim because the state law claim of trade secret misappropriation is so closely related to Plaintiff's claim for misappropriation of trade secrets under the DTSA that they form part of the same case or controversy.

10.  In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, excluding interest and costs, and the parties are citizens of different states.

11.  Personal jurisdiction exists over Defendant because, on information and belief, Defendant has conducted and continues to conduct business in this District.

12.  Defendant is a nonprofit corporation that is responsible for setting the rules and standards regarding boiler and pressure vessel inspections, including in Florida. Further, Defendant's objective is to promote

4

uniformity in inspection codes. Defendant hosts annual conferences open to inspectors and engineers across the country to discuss updates to the inspection standards while touting the JRS Product as the solution to following such standards. Defendant hosted two such annual conferences in Florida between 2013 and 2016. As such, Defendant has established minimum contacts with this District, such that it should reasonably and fairly anticipate being called into court in this District and has purposefully directed activities at residents in Florida and this District.

13.    Further, on information and belief, this Court has personal jurisdiction over Defendant because Defendant has committed acts of trade secret misappropriation in the state of Florida and in this District. As such, Defendant has established minimum contacts with this District, such that it should reasonably and fairly anticipate being called into court in this District and has purposefully directed activities at residents in Florida and this District. Defendant, directly or indirectly, sells JRS subscriptions in Florida through its website (https://www.nationalboard.org/Index.aspx?pageID=1548), which is readily accessible to residents of Florida and this District. Defendant has therefore purposefully directed its commercial activities to residents in Florida.

14.   More specifically, as a result of Defendant's misappropriation of CentralSquare's trade secrets, Defendant has caused CentralSquare to suffer injury primarily felt in Florida, where CentralSquare has its principal place of business.

15.   Additionally, Defendant purposefully availed itself of the laws of Florida. Its conduct was intentional, aimed at Florida, and caused harm that Defendant should have anticipated would be suffered in Florida. Defendant's conduct was aimed at Florida because its conduct was directed at CentralSquare. Defendant knew that CentralSquare has its principal place of business in Florida and entered into a data sharing agreement with CentralSquare acknowledging as such. Further, Defendant actively works with residents in the forum as a national standard setting entity. Thus, Defendant has purposefully directed its activities at residents in the forum. As a result of Defendant's intentional misconduct against CentralSquare, a Florida resident, this Court has personal jurisdiction over Defendant.

16.   Venue is proper in this federal district pursuant to 28 U.S.C. § 1391(b)(2) because, on information and belief, a substantial part of the events giving rise to CentralSquare's claims occurred in this District, including that employees of Defendant misappropriated the

JO Trade Secrets in this District.

## FACTUAL BACKGROUND

### CentralSquare and its innovative JO Product

17.    CentralSquare is a pioneer and leading innovator in public sector software, serving over 8,000 public safety and public administration agencies across North America. One such software product is CentralSquare's JO Product, which allows users to access jurisdictional object inspections and certifications and helps governments and insurance companies regulate potentially dangerous equipment. Prior to the creation of the JO Product, inspection information was maintained in paper files, or in unshared databases maintained by local governments, state governments, and insurance companies. Record sharing, if it occurred at all, was a time-consuming and tedious process that could take days or even weeks. The shared database, maintained by Jurisdiction Online, is accessible via an online portal.



18.   The JO Product was among the first online inspection software that included a shared database to allow for the easy transfer of information and records between entities. By creating a system with a shared database, the chance of equipment falling through the cracks, missing required inspections, and then failing and potentially injuring members of the public was greatly decreased. The JO Product is a pioneering system in online inspection software and has been adopted by 33 state regulatory agencies, over 90 local jurisdictions, and multiple Fortune 500 companies. As of 2024, all 13 insurance carriers that operated boiler/pressure vessel insuring units utilized the JO Product. In 2024 alone, the JO Product assisted in the completion of approximately 1,078,198 inspections, processed approximately

$63,428,755.83 in invoices, managed the inspection of an estimated 2,738,392 objects, and issued over one million permits.

19. CentralSquare's JO Product was developed and maintained with the assistance of Jacques Couvillon, Catherine Lippert, Chris Costakis, Levi Hinze, LaShea Brittain, Matt Lay, and Evan Lay (the "Departed Employees"). The Departed Employees created the underlying code and features that make up part of the JO Trade Secrets. This includes at least the underlying architecture and source code for the JO Product and the business plans for the JO Product.

20. CentralSquare developed and maintained the JO Product based on JO Trade Secrets. CentralSquare purchased the rights to the JO Product from Aptean, Inc. ("Aptean") for CentralSquare's exclusive use in the United States in 2018. Aptean initially acquired the rights to the JO Product from Praeses LLC in late 2017. Throughout the various acquisitions, employees were required to sign new offer letters, which contained provisions explaining that the intellectual property would remain with the acquiring company. In signing these offer letters, each employee was afforded the opportunity to list any intellectual property they believed belonged to them. None of the Departed Employees claimed an ownership interest in the JO Product or its

9

underlying intellectual property. CentralSquare continues to protect the software that comprises the JO Trade Secrets.

21.   CentralSquare's JO Trade Secrets allow for the JO Product to access a large-scale jurisdictional network in an efficient and cost-effective way. CentralSquare's JO Trade Secrets further incorporated information obtained from customers through feedback and related investigations to improve the JO Product. CentralSquare has maintained and protected the JO Product as a unique combination of software such that the design, process, and operation are interrelated to make the JO Product function. The JO Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, CentralSquare's competitors and others who would obtain economic value from the use or disclosure of that information.

22.   CentralSquare actively protects and safeguards the confidentiality of the JO Trade Secrets. For example, CentralSquare regularly provides its employees with training on maintaining the secrecy of the JO Trade Secrets. One such training is a course on confidential information. This required course was included in the employee handbook, and it informed employees that they were responsible for protecting confidential information. The course further instructed

employees how to identify and protect trade secrets such as designs, formulas, and methods. The course also informed employees that CentralSquare closely guards its trade secrets. Eventually, the Departed Employees left CentralSquare and began working at NBBI. Afterwards, NBBI released the JRS Product as a competing product to the JO Product. The functionality of the JRS Product is identical to the functionality of the JO Product in all material respects.

**Defendant Misappropriated CentralSquare's JO Trade Secrets**

23. On information and belief, Defendant misappropriated CentralSquare's confidential and proprietary trade secret information to gain technology and know-how to assist with the development of its JRS Product with lower costs and faster development times.

24. CentralSquare first suspected the misappropriation of its JO Trade Secrets at NBBI's annual conference on July 10, 2023, when a JO Product customer informed CentralSquare that the JRS Product "looked like a copy" of CentralSquare's JO Product. Shortly thereafter, CentralSquare investigated the merits of the accusation and concluded that NBBI, through the knowledge of the Departed Employees, misappropriated the JO Trade Secrets.

25. On information and belief, Defendant currently creates, implements, and sells the JRS Product, and has been creating, implementing, and

11

selling the JRS Product since 2023. Several features of the JRS Product are identical to features in the JO Product and implement the same processes as the JO Product.

26. On information and belief, Defendant currently employs and has received information from the Departed Employees to create the JRS Product, including CentralSquare's JO Trade Secrets. This allowed NBBI to create and release the JRS Product within four years, a feat that took CentralSquare and its predecessors nearly two decades to accomplish. On information and belief, NBBI could not have independently developed its JRS Product in the timeframe it did without the wrongful acquisition and use of the JO Trade Secrets. Instead, NBBI chose to misappropriate CentralSquare's trade secrets through the Departed Employees. Armed with the JO Trade Secrets, upon information and belief, NBBI could save yearsof development time and establish a product to compete with CentralSquare.

27. More specifically, on information and belief, examples of the JO Trade Secrets Defendant misappropriated include the following trade secrets:

**Source Code Trade Secrets**

28. The JO Trade Secrets include all source code versions for the JO Product, including proprietary algorithms for inspection scheduling

12

and record sharing. Examples of the source code JO Trade Secrets include the following trade secrets:

(1) The source code for JO that creates objects in the database.

(2) The source code for JO that transfers objects within the database.

(3) The source code for JO that stores objects in the database.

(4) The source code for JO that determines the controlling jurisdiction.

(5) The source code for JO that performs error checks for data.

(6) The source code for JO that supports different jurisdiction-specific forms.

(7) The source code for JO that generates forms based on jurisdictional requirements.

(8) The source code for JO that generates and updates data in real time.

(9) The source code for JO that verifies inspector commission status.

(10)    The source code for JO that schedules functions to be performed in the system.

(11)    The source code for JO that provides the appropriate jurisdictional inspection data requirements.

13

(12)    The source code for JO that provides a comparison of changed information to facilitate review.

(13)    The source code for JO that schedules inspections with available inspectors.

(14)    The source code for JO that generates and provides inspection certificates upon completion.

(15)    The source code for JO that implements JO in a distributed environment.

(16)    The source code for JO that generates a tiered application architecture.

(17)    The source code for JO that manipulates inspection data.

(18)    The source code for JO that generates location-unit validation checks.

(19)    The source code for JO that generates unique location identifiers.

(20)    The source code for JO that generates object-unit validation checks.

(21)    The source code for JO that generates unique object identifiers.

(22)    The source code for JO that provides data-entry validation checks.

14

(23)    The source code for JO that generates and provides a certificate of compliance.

(24)    The source code for JO that ensures user authority within the assignment unit.

(25)    The source code for JO that automatically schedules inspections for units with upcoming due dates.

(26)    The source code for JO that places a task in an inspection listing.

(27)    The source code for JO that places a task in a review-changes listing.

(28)    The source code for JO that ensures user authority within the review unit.

(29)    The source code for JO that provides review information, including comments and edits.

(30)    The source code for JO that adds and sets user rights within the administration unit.

(31)    The source code for JO that sends administrative messages.

(32)    The source code for JO that tracks users.

(33)    The source code for JO that sets commissions on inspections.

15

(34)   The source code for JO that determines possible inputs based on user input through predictive logic.

(35)   The source code for JO that generates tasks for objects.

(36)   The source code for JO that calculates required inspections based on prior inspection dates and required frequencies.

(37)   The source code for JO that assigns inspections to users.

(38)   The source code for JO that performs error checks on inspections.

(39)   The source code for JO that schedules reviews for inspection results.

(40)   The source code for JO that decommissions objects.

(41)   The source code for JO that stores review comments.

(42)   The source code for JO that authorizes the provision of payment.

(43)   The source code for JO that schedules additional reviews of objects.

(44)   The source code for JO that associates objects, locations, insurance, inspectors, and reviews.

(45)   The source code for JO that manipulates and reports associated data.

(46)   The source code for JO that stores security information.

(47) The source code for JO that generates and stores unique identifier numbers.

(48) The source code for JO that secures stored data.

(49) The source code for JO that appends new data to old data for archival or display purposes.

(50) The source code for JO that generates a homepage layout for a user.

(51) The source code for JO that creates administrative routines and functionalities.

(52) The source code for JO that determines when and how to present system messages.

(53) The source code for JO that generates safety bulletins.

(54) The source code for JO that alters user data, including permissions.

(55) The source code for JO that determines whether variation information should be entered.

(56) The source code for JO that selects and lists tasks in the user's dashboard.

(57) The source code for JO that imposes notifications on tasks according to defined criteria.

(58) The source code for JO that embeds an inspection hotlink

into search results.

(59)    The source code for JO that embeds an object-search hotlink into search results.

(60)    The source code for JO that stores and retrieves previous location recommendations and violations.

(61)    The source code for JO that embeds object history into search results.

(62)    The source code for JO that stores and retrieves previous object recommendations and violations.

(63)    The source code for JO that automatically generates inspector names by determining availability and assigning inspections.

(64)    The source code for JO that determines the type of review required.

(65)    The source code for JO that handles exceptions for edge cases such as rejected inspections or certificate blocking.

(66)    The source code for JO that implements notification and escalation protocols.

(67)    The source code, APIs, protocols, and mappings for JO that connect the platform with external systems.

(68)    The source code for JO that supports application-server

18

logic and client-side logic.

(69)    The source code for JO that retrieves search results from the database.

(70)    The source code for JO that presents reports for objects.

(71)    The source code for JO that saves queries.

(72)    The source code for JO that allows users to modify template language.

(73)    The source code for JO that allows users to merge object information.

(74)    The source code for JO that performs automated data-inconsistency identification.

(75)    The source code for JO that improves report synchronization.

(76)    The source code for JO that improves data-discrepancy detection.

(77)    The source code for JO that integrates the payment system into the platform.

**Business Plan Trade Secrets**

29.    The JO Trade Secrets include unreleased business plans, including confidential information regarding customer feedback, which are not publicly available and were developed for a future update. Examples

19

of these JO Trade Secrets include the following trade secrets:

(78)    The business plan for JO that supports allowing users to modify template language.

(79)    The business plan for JO that supports improvements in data synchronization with discrepancy detection.

(80)    The business plan for JO that supports improvements to report synchronization.

(81)    The business plan for JO that supports improvements to data-discrepancy detection.

(82)    The business plan for JO that outlines a migration path to a standardized, cloud-native end-state product.

(83)    The business plan for JO that describes how search criteria are selected based on customer usage.

(84)    The business plan for JO that supports integrating a single, hosted SaaS database to facilitate simultaneous reporting.

**Computer Architecture Trade Secrets**

The JO Trade Secrets include the underlying architecture for the source of the JO Product's hardware and software, including the manner in which data is stored and processed as well as industry specific features developed by CentralSquare to allow the JO Product to manage and regulate inspections and certifications for jurisdictions

and insurance providers in a single platform. Examples of these JO Trade Secrets include the following trade secrets:

(85)    The system for JO that uses a central staging database that provides a single interface for all inspections.

(86)    The system for JO that uses a hierarchical data structure with reverse delta storage.

(87)    The computer architecture for JO that enables JO in a distributed environment by defining where and how data structures are stored.

(88)    The schema design for JO that specifies detailed normalization and indexing strategies for data.

(89)    The system for JO that uses data-transformation and normalization techniques to handle diverse jurisdictional requirements.

(90)    The system for JO that implements unique software design patterns, deployment strategies, and hardening techniques.

(91)    The system for JO that includes performance optimization and scalability solutions.

(92)    The system for JO that implements logic for dynamically generating and validating forms based on jurisdictional rules.

21

(93)    The system for JO that uses proprietary algorithms to generate compliance reports, inspection summaries, and trend analyses.

(94)    The system for JO that generates data-visualization elements and dashboard displays.

(95)    The configuration files and scripts for JO that tailor the system for different clients or jurisdictions.

30.    The specific implementations, logic, structures, and code segments embodying these trade secrets are detailed in Appendices A–C, which are available for the Court and Defendant to inspect under seal. The above asserted JO Trade Secrets related to source code are exemplified in Appendix A. The above asserted JO Trade Secrets related to confidential business plans are exemplified in Appendix B. The above asserted JO Trade Secrets related to computer architecture are exemplified in Appendix C. These exemplary disclosures identify representative portions of the JO Trade Secrets and associated functionality that embody the JO Trade Secrets. Appendices A, B, and C are not intended to catalogue every line, file, module, or implementation detail that constitutes or reflects the JO Trade Secrets. Rather, the disclosures are illustrative and sufficiently particular to identify the JO Trade Secrets while

22

recognizing that the underlying confidential concepts, structures, logic, and implementations extend beyond the specific examples identified.

31. Each of the asserted JO Trade Secrets are standalone trade secrets. On information and belief, NBBI developed the JRS Product using the same source code and computer architecture in the JO Product to implement identical features and functionalities using similar hardware and software without NBBI needing to invest its own resources into researching customer requests or preferences, developing source code, and creating a computer architecture to implement these functionalities.

32. Relatedly, on information and belief, NBBI received information from the Departed Employees regarding the business plans for the JO Product in order to implement features into the JRS Product that CentralSquare invested time and resources on discovering and researching for the JO Product.

33. The Departed Employees were employed by CentralSquare as product owners, product directors, and software developers for the JO Product: roles that granted the Departed Employees access to all of the JO Trade Secrets. The Departed Employees were then specifically hired by NBBI to create the JRS Product. The Departed Employees

played significant roles in the development of the JRS Product. In fact, the plan to create the JRS Product began with hiring Departed Employee Jacques Couvillon, and no lines of JRS code were written until after Departed Employee Evan Lay was hired by NBBI. On information and belief, Defendant welcomed the Departed Employees' expertise and misappropriated JO Trade Secrets that would substantially aid Defendant's development of the JRS Product.

34. Departed Employee Jacques Couvillon was CentralSquare's Director of Product Management and is NBBI's current Director of Product Management. Mr. Couvillon was and is involved in the business side of developing the JRS Product, dictating to developers of the JRS Product their duties and tasks related thereto, writing specifications for the JRS Product, and hosting demos and training sessions. Mr. Couvillon also has been and continues to be involved in marketing and promoting the JRS Product, including by holding client advisory board meetings, prospect demonstrations, annual events/meetings, and trainings.

35. Departed Employee Catherine Lippert was a Product Owner at CentralSquare and is NBBI's current Manager of Product Services. Ms. Lippert was and is involved in managing the product mangers responsible for developing and implementing the JRS Product.

36. Departed Employee Chris Costakis was Vice President of Information Technology at CentralSquare's predecessor, Praeses, and is NBBI's current Director of Information Technology. Mr. Costakis was and is responsible for maintaining the computer systems used to develop and implement the JRS Product.

37. Departed Employee Levi Hinze was an Associate Architect at CentralSquare and is NBBI's current Director of Software Engineering. Mr. Hinze is the head of development and NBBI, and developers of the JRS product report to Mr. Hinze.

38. Departed Employee Evan Lay was a developer for CentralSquare and is NBBI's current Software Engineering Manager. Ms. Lay manages four developers responsible for coding related to the JRS product.

39. Departed Employee Matt Lay was a software developer for CentralSquare and is currently Software Engineer III at NBBI. Mr. Lay writes code and assisted in development of the JRS product.

40. Departed Employee LaShea Brittain was a UX Engineer for Jurisdiction Online and is currently NBBI's User Interface Designer I. Ms. Brittain was and is responsible for designing the graphics that the user sees when utilizing the JRS Product.

41. On information and belief, Defendant hired the Departed Employees because it knew they would be able to help Defendant speed up the

25

development of its competing product by using the confidential and proprietary information of its competitor, CentralSquare.

42. CentralSquare, along with its predecessors, requires all employees to sign an agreement with non-disclosure obligations, requiring all executing parties to maintain the confidentiality of CentralSquare's confidential information. CentralSquare and its predecessors' employment agreements also contain noncompete, nonsolicitation, and nonrecruitment provisions.

43. Given the Departed Employees' positions at CentralSquare, their access to CentralSquare's information and source code, and their post-CentralSquare roles in developing the JRS Product at NBBI, CentralSquare believes that the Departed Employees improperly retained, accessed, disclosed, and/or used the JO Trade Secrets.

44. Defendant's conduct threatens uncontrolled and irreparable access, use, and dissemination of CentralSquare's trade secrets and confidential information. Defendant's willful and malicious misappropriation of the JO Trade Secrets requires CentralSquare to file this lawsuit seeking injunctive relief and damages for the harm that has been caused by Defendant's illegal conduct. Unless enjoined, CentralSquare will be deprived of the advantage lawfully earned through the hard work, years of development, and significant

26

financial investments and risks, all while Defendant took its illegal developmental shortcut and economic windfall at CentralSquare's expense.

### Defendant's Misappropriation Damages CentralSquare

45. On information and belief, Defendant improperly acquired and used (and continues to use) CentralSquare's JO Trade Secrets. Instead of investing the substantial time and resources to compete legitimately with CentralSquare or licensing CentralSquare's JO Product, Defendant has used, and continues to use, CentralSquare's JO Trade Secrets to secure more of CentralSquare's customers.

46. CentralSquare thus requests that this Court award reasonable compensation for Defendant's misappropriation of CentralSquare's JO Trade Secrets, including exemplary damages for Defendant's willful and malicious misappropriation, and further requests that this Court grant an injunction against Defendant to prevent ongoing wrongful use and disclosure of CentralSquare's JO Trade Secrets.

### COUNT I

### Violation of the Defend Trade Secrets Act

47. CentralSquare realleges and incorporates by reference paragraphs 1-46 as if fully set forth in this paragraph. These paragraphs

27

demonstrate the elements necessary to establish liability under the DTSA.

48. The DTSA provides a federal private right of action for misappropriation of trade secrets. 18 U.S.C. § 1836(b). CentralSquare owns trade secrets, as defined by the DTSA, which relate to CentralSquare's JO technology and which Defendant has willfully and maliciously misappropriated. CentralSquare's JO Trade Secrets are used in the creation of the JO Product that is used and intended for use in interstate commerce.

49. CentralSquare took reasonable measures to ensure the confidentiality of its JO Trade Secrets, including the execution by CentralSquare of its employment agreements and requiring training on confidentiality. These agreements include provisions intended to safeguard the confidentiality of CentralSquare's JO Trade Secrets. Additionally, the confidentiality training explained the duty on employees to preserve CentralSquare's trade secrets. CentralSquare's JO Trade Secrets derive their economic value from not being generally known to, and not being readily ascertainable through proper means by, others who can obtain economic value from the JO Trade Secrets.

50. Defendant misappropriated CentralSquare's JO Trade Secrets at least by using the JO Trade Secrets without CentralSquare's consent,

and by having acquired the JO Trade Secrets under circumstances giving rise to duties to maintain the secrecy of the JO Trade Secrets and to limit their use. Defendant's unauthorized and improper use of CentralSquare's JO Trade Secrets is ongoing and continues to this day.

51. CentralSquare has no adequate remedy at law to protect against Defendant's actual and threatened misappropriation and use of the JO Trade Secrets. Moreover, Defendant's misappropriation and use of the JO Trade Secrets has caused and will cause irreparable injury to CentralSquare, including the loss of customer goodwill, competitive position, and future business. No amount of money can fully and accurately compensate CentralSquare for these losses, so CentralSquare's remedies at law are therefore inadequate. Thus, injunctive relief is necessary and appropriate to restrain Defendant's misappropriation.

52. As a direct and proximate result of Defendant's actual and threatened misappropriation of CentralSquare's JO Trade Secrets, CentralSquare has suffered damages, and Defendant has been unjustly enriched. Thus, CentralSquare is entitled to relief under the DTSA. By reason of Defendant's willful and malicious acts of

misappropriation, CentralSquare is also entitled to exemplary damages and attorneys' fees under the DTSA.

## COUNT II

### Violation of the Florida Uniform Trade Secrets Act

53.  CentralSquare realleges and incorporates by paragraphs 1-46 as if fully set forth in this paragraph. These paragraphs demonstrate the elements necessary to establish liability under the FUTSA.

54.  CentralSquare's confidential information regarding its JO Product technology constitutes a trade secret under the FUTSA, Fla. Stat. § 688.002(4). CentralSquare's JO Trade Secrets are extremely valuable to CentralSquare because they are secret and are not generally known to, and not readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and CentralSquare has expended reasonable time, effort, and money to develop and safeguard them, and maintain their secrecy. Because CentralSquare knows this information, but others in the industry do not, CentralSquare has been able to compete more effectively in the market. By misappropriating CentralSquare's JO Trade Secrets, Defendant has been, and will continue to, compete unfairly with CentralSquare.

55. On information and belief, Defendant has willfully and maliciously misappropriated CentralSquare's JO Trade Secrets. Defendant has engaged in use and threatened use of CentralSquare's JO Trade Secrets without CentralSquare's consent and has acquired the JO Trade Secrets under circumstances giving rise to duties to maintain their secrecy and limit their use. Defendant's improper and unauthorized misappropriation of CentralSquare's JO Trade Secrets is ongoing and continues to this day.

56. Unless enjoined by this Court, Defendant will continue to misappropriate CentralSquare's JO Trade Secrets. Moreover, Defendant's misappropriation and use of CentralSquare's JO Trade Secrets has caused and will cause irreparable injury to CentralSquare, including the loss of customer goodwill, competitive position, and future business. No amount of money can fully compensate CentralSquare for these losses, so CentralSquare's remedies at law are therefore inadequate. Thus, injunctive relief is necessary and appropriate to restrain Defendant's misappropriation.

57. As a direct and proximate result of Defendant's actual and threatened misappropriation of CentralSquare's JO Trade Secrets, CentralSquare has suffered losses, and Defendant has been unjustly enriched. Thus, CentralSquare is entitled to damages. By reason of

Defendant's willful and malicious acts of misappropriation, CentralSquare is also entitled to exemplary damages and attorneys' fees.

## PRAYER FOR RELIEF

Wherefore, CentralSquare respectfully requests:

(a) Judgment be entered that Defendant has misappropriated CentralSquare's JO Trade Secrets;

(b) That the Court enjoin Defendant from disclosing, using, or allowing any other individual or entity to disclose or use, for any purpose, CentralSquare's JO Trade Secrets and confidential information;

(c) That the Court award CentralSquare damages caused by Defendant's misappropriation of CentralSquare's JO Trade Secrets;

(d) That the Court award CentralSquare damages for the unjust enrichment caused by Defendant's misappropriation of CentralSquare's JO Trade Secrets;

(e) That the Court award CentralSquare exemplary damages caused by Defendant's willful and malicious misappropriation of CentralSquare's JO Trade Secrets;

(f) That the Court award CentralSquare pre-judgment and post-judgment interest where applicable;

(g) That the Court award CentralSquare the reasonable attorneys' fees and costs that it incurs in bringing and prosecuting this action; and

(h) That the Court award CentralSquare any other relief this Court deems just and equitable.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury on all issues triable of right by a jury.

Dated: July 9, 2026                    Respectfully submitted,


*/s/ Lionel M. Lavenue*
Lionel M. Lavenue
FL Bar No. 947032
lionel.lavenue@finnegan.com
FINNEGAN, HENDERSON,
FARABOW, GARRETT &
DUNNER LLP
1875 Explorer Street, Suite 800
Reston, VA 20190-6023
Phone: (571) 203-2700

***Attorney for Plaintiff***
***CENTRALSQUARE***
***TECHNOLOGIES, LLC***

33